**In re Wayne Melvin McGOHAN, Margaret Mary McGohan, Debtors.**

**S.E. NICHOLS, INC., Plaintiff,**

**v.**

**Wayne Melvin McGOHAN, Defendant.**

**Bankruptcy No. 84–00428.
Adv. Pro. No. 84–0105.**

United States Bankruptcy Court,
N.D. New York.

April 21, 1986.

Basloe & Basloe, P.C., Herkimer, N.Y., for plaintiff; Irving M. Basloe, of counsel.

**MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

STEPHEN D. GERLING, Bankruptcy Judge.

S.E. Nichols, Inc. ("Nichols") filed its complaint to determine the dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4) and § 523(a)(6) ("the Code"). Specifically, Nichols alleged

the Debtor, Wayne Melvin McGohan ("McGohan") converted and/or embezzled certain funds while the latter was employed by Nichols. While McGohan is a joint petitioner in bankruptcy, this matter is advanced against him individually. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(I).

## PROCEDURE

McGohan and his spouse, Margaret Mary McGohan, filed their voluntary petition for relief under Chapter 7 of the Code on May 17, 1984. Nichols was scheduled by Debtors as an unsecured creditor of McGohan individually; the liquidated amount of claim was listed as $62,547.74, due to a judgment docketed August 15, 1983.

Nichols' adversary proceeding was commenced on August 15, 1984. Thereafter, Nichols moved for summary judgment, and by Order dated April 1, 1985, the Court awarded Nichols partial summary judgment in the amount of $1,500.00 (which sum was declared nondischargeable). The parties were directed to set a trial date to determine the extent of Nichols' damages, if any, in excess of the $1,500.00, and whether such damages were also nondischargeable. Trial was set for May 17, 1985, but due to the retirement of the Honorable Leon J. Marketos, U.S. Bankruptcy Judge, the matter was adjourned to the Court's suspension calendar for hearing by his successor.

During the course of the above, McGohan had been represented by counsel. However, on November 25, 1985, the Debtors' attorneys moved to withdraw their representation. This action served to disrupt the commencement of the re-scheduled trial, which had been set for December 4, 1985. By Order dated December 13, 1985, Debtors' counsel was permitted to withdraw as attorney in both the bankruptcy case and the present adversary proceeding. The withdrawal was permitted based upon the affidavits and exhibits of Debtors' counsel, detailing at least five written requests from counsel to Debtors urging office appointments so as to prepare for trial.

Debtors apparently ignored each letter request.

Notice of trial was issued by the Bankruptcy Clerk's office on January 14, 1986, indicating trial was scheduled for February 19, 1986. On this date, trial before the Court commenced with McGohan failing to appear. At no time prior or subsequent to the trial did McGohan contact the Court with regard to his representation, or his ability to proceed on his own behalf. Nichols presented its proof to the Court at that time, and it is upon the trial record, as well as the various documents comprising the file herein, that this decision rests.

## FINDINGS OF FACT

Nichols is a New York corporation engaged in the business of operating retail department stores; one such store is located in Auburn, Cayuga County, New York ("Store"). McGohan was employed as the Manager of the appliance department of the Store from June, 1979 until August 10, 1982, with a portion of his duties entailing the retail sale of goods to Nichols' customers.

John S. Klune ("Klune"), the Store manager during the time of McGohan's employment, testified as to Nichols' record-keeping procedure for sales made by employees such as McGohan. Each salesperson would be issued a book containing twenty-five sequentially numbered form receipts—each receipt comprised of a white "customer" copy, a yellow "commission" copy, a blue "delivery" copy and a pink "file" copy. The latter three copies were carbons of the white customer copy. The employee would sign the front cover of each book, with no other employee using the book so issued to record retail sale transactions. After the twenty-five receipts were used to record transactions, the employee would deliver the book to the Store's office and a new receipt book issued. During the course of a typical transaction, a salesperson would complete a form receipt, entering such information as the customer's name and address, date, department and store number, the description of the item purchased, and purchase price. The transaction would also

be rung up on a cash register located in the department.

Klune testified that each cash register recorded transactions on two rolls of paper; an outer roll emitted from the register's interior (comprising the common "sales slip"), and the inner roll, being a carbon of the other, comprised a continuous record of all transactions entered. After a sale was rung upon the register, the customer would be given the white copy of the form receipt, and the cash register sales slip was to be stapled to the face of the appropriate yellow "commission" copy. The employee was then to utilize an inked-stamp to imprint the "commission" copy with the Nichols' store identification number, in this case "# 21". The pink "file" copy would remain attached to the receipt book, the blue "delivery" copy either removed or remaining attached depending upon the delivery instructions for the purchased goods, and the yellow "commission" copy, together with attached sales slip turned into the Store's main office for determination of the sales person's commission. Afterwards, the Store's main office would staple the yellow "commission" copy with sales slip attached to the pink "file" copy still a part of the receipt book. The used sales receipt books were then stored by the Store.

Each sales transaction recorded by the cash register was given a number by the machine which appeared on both the external sales slip and internal roll. Further, under normal circumstances, the purchase price on each sales slip was to coincide with the purchase price entered on the form receipts by the employee.

Klune testified that sometime shortly before August 10, 1982, he was informed by a store security person that the latter had observed McGohan pocketing money after completing a sales transaction with a customer. Klune then investigated the used sales receipt books turned in by McGohan. He observed that on a number of form receipts, the store identification number had been stamped so as to obliterate the purchase price appearing on the attached sales slip. His further examination revealed that the purchase price on these sales slips did not match that entered by McGohan on the receipt form to which they were attached. For certain transactions, a comparison of the internal register rolls, the sales slips, and the written information contained on the form receipts indicated wide variations between the purchase price entered on the form receipt, and that rung upon the register by McGohan.

Klune then contacted his superior, James Mitchell ("Mitchell"), Nichols' district manager, with his initial findings. Mitchell, Klune and a Nichols' security person thereafter sorted through all sale receipt books used by McGohan from May 17, 1979 until August 13, 1982. Over the course of three to four days, they compiled a twenty-four page summary listing all McGohan sales wherein a discrepancy lay between the amount rung upon the register by McGohan and that written by McGohan on the form receipt. The total difference was $55,959.47. McGohan had been paid a 2% commission on the sales amounts tallied from the form receipts. As these amounts had never actually been received by Nichols, McGohan had improperly received an additional $1,119.18 ($55,959.47 × .02), for a total amount of $57,078.65. On the basis of these findings, Nichols contacted the police. McGohan was charged with the crime of grand larceny in the second degree, a Class D Felony in the State of New York. N.Y.Penal Law § 155.35 (McKinney 1975).

On September 14, 1982, McGohan, represented by counsel, appeared before the Honorable Peter E. Corning, County Court Judge for Cayuga County, New York. McGohan voluntarily waived his right to Grand Jury proceedings, and further entered a guilty plea to the charge. McGohan did, however, contest the amount of money stolen, admitting only that it was more than $1,500.00 (the minimum value of property stolen for purposes of N.Y.Penal Law § 155.35. McGohan then informed Judge Corning of the mechanics of his scheme, reciting his theft of the difference between the actual sale and that which he

entered in the register.[1] On October 21, 1982, McGohan was sentenced to an indeterminate term of one to three years in a state prison.

This sentence was appealed, with the New York Supreme Court, Appellate Division, Fourth Department ordering reconsideration. Re-sentencing was held on July 21, 1983, with McGohan re-sentenced to a term of probation for five years, and further ordered to pay restitution in the amount of $50.00 per week. During the course of this hearing, Judge Corning set the amount of damages at $58,344.88. This Court is unclear as to how Judge Corning determined McGohan's obligation in this amount.

Nichols thereafter commenced a civil suit against McGohan in the New York Supreme Court, Oneida County, seeking judgment for the embezzled amounts. On the basis of a summary judgment proceeding, judgment was entered against McGohan in Nichols' favor in the amount of $62,547.74 (principal of $57,078.66; interest of $5,137.08; costs/disbursements of $332.00). It is this sum that McGohan has scheduled as a debt due Nichols.

### CONCLUSIONS OF LAW

Nichols had originally requested the Court grant it judgment on its adversary complaint herein on the basis of collateral estoppel, by virtue of the civil judgment obtained in the New York Supreme Court, Oneida County. However, the Court, cognizant of the heightened burden of proof required in dischargeability proceedings, required Nichols to present its proof in an evidentiary hearing. *In re Magnusson,* 14 B.R. 662, 667 (Bankr.N.D.N.Y.1981); *In re Rodriguez,* 29 B.R. 537, 539 (Bankr.E.D.N.Y.1983). As the civil suit commenced in New York Supreme Court, Oneida County was resolved by that court utilizing standards less stringent than those used in bankruptcy dischargeability actions, collateral estoppel was deemed inappropriate. *In re Katz,* 20 B.R. 394, 397 (Bankr.D. Mass.1982). Hence, the Court's decision

herein is not based upon any matter which may have been resolved in the earlier civil action. This is particularly true on the seminal issue as to the amount of money stolen by McGohan.

While adequate notice was given McGohan of the trial held before the Court on February 19, 1986, McGohan failed to appear and present testimony on his behalf. As bankruptcy adversary proceedings are civil proceedings, an adverse inference may be drawn against a party when they refuse to testify in response to probative evidence offered against them. *cf., Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821, (1976) (discusses inappropriateness of this inference in criminal cases). The Court, absent information from McGohan to the contrary, can only infer that his failure to appear was deliberate, and further, that his testimony would have been unfavorable to his case. *Stoumen v. Commissioner,* 208 F.2d 903, 907 (3d Cir.1953).

Based upon the evidence presented, particularly the testimony of Klune and Mitchell, the Court finds that McGohan intentionally stole $57,078.66 from Nichols during the course of his employment. This sum is derived from the $55,959.47 discrepancy of the sales transactions, and the $1,119.18 paid to McGohan as commissions on this amount. McGohan's scheme is well-documented; the Court has reviewed the physical evidence presented, most notably the internal register tapes, McGohan's used form receipt books, and the compilation of the questionable transactions promulgated by Klune and Mitchell.

Concerning the compilation or summary prepared by Nichols' agents, the Court holds that a proper foundation was laid for its admissibility as the records which it summarizes would themselves have been admissible. The Court believes the summary to be accurate, and the records had been available to McGohan had he chosen to exercise his prerogative of inspection. Fed.R.Evid. 1006; *Needham v.*

---

1. Transcript of proceedings before the Cayuga County Court, Peter E. Corning presiding, September 14, 1982, *People v. McGohan,* p. 20, l. 1–19.

*White Laboratories, Inc.,* 639 F.2d 394, 403 (7th Cir.1981). The review indicates that the majority of sale discrepancies are in the amount of $50.00 or $100.00, with some as high as $400.00. For example, during a week ending April 24, 1982, seven improper sales transactions were conducted by McGohan. The form receipts total $1,212.53, but the corresponding sales slips total $7.29. Similarly, for the six questionable sales during the week ending May 1, 1982, $557.19 was the total of the form receipts, with only $6.02 entered by McGohan into the cash register. The evidence indicates that McGohan became more emboldened as his embezzlement continued, for the sales price discrepancies increase in amount over the course of his three years of felonious conduct.

The evidence presented clearly establishes McGohan's actual intent to embezzle certain of the sums placed in his control, with the debt thus nondischargeable pursuant to § 523(a)(4) of the Code. While the Court believes sufficient direct proof was proffered in this regard, clearly the requisite intent may be established inferentially by circumstantial proof. *New York Credit Men's Adjustment Bureau, Inc. v. Adler,* 2 B.R. 752, 756 (S.D.N.Y. 1980); *Lesser v. Jewel Factors Corp.,* 470 F.2d 108, 110 (2d Cir.1972). The obliterated amounts on the sales slips, the discrepancy between internal register tapes and form receipts, the fact that McGohan was the only person to use the form receipt book, all support the inference McGohan possessed the requisite intent to embezzle the funds.

As for the amount of the sums stolen, the Court finds that Nichols has sustained its heightened burden of proof, substantiating the claim that McGohan misappropriated $57,078.66 from his employer. This amount, adduced by Klune and Mitchell after lengthy examination of the actual records, is uncontroverted by McGohan, whose failure to appear and testify further buttresses the Court's finding in this regard. The Court has reviewed those additions to the principal amount entered by the New York Supreme Court of Oneida

County on August 8, 1983, and determines them to be proper.

Finally, the Court has reviewed the statutory authority which Nichols alleges support its claim that McGohan's debt is nondischargeable. Sufficient evidence being presented to uphold nondischargeability of the debt pursuant to § 523(a)(4), the Court limits its decision to that provision of the Code, and makes no findings regarding nondischargeability pursuant to § 523(a)(2) or § 523(a)(6).

As a consequence of the foregoing, it is determined and

ORDERED:

1. That the debt due and owing S.E. Nichols, Inc. from the Debtor, Wayne Melvin McGohan is in the amount of $62,-547.74, with interest thereon at the legal rate from August 8, 1983. The debt is excepted from discharge pursuant to § 523(a)(4) of the Code.